**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The NATURAL GAS UTILITY DIS-TRICT OF HAWKINS COUNTY, TENNESSEE, Respondent.**

No. 19186.

United States Court of Appeals, Sixth Circuit.

March 17, 1970.

Combs, Circuit Judge, dissented.

Kenneth T. Pearlman, National Labor Relations Board, Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Atty., National Labor Relations Board, Washington, D. C., on the brief.

Eugene Greener, Jr., Memphis, Tenn., for respondent; Buchignani & Greener, Memphis, Tenn., J. O. Phillips, Jr., Phillips & Hale, Rogersville, Tenn., on the brief.

Before WEICK, COMBS and BROOKS,* Circuit Judges.

---

* The Honorable Henry L. Brooks, then Chief Judge, United States District Court for the Western District of Kentucky, sitting by designation. Judge Brooks has since become a member of this Court.

WEICK, Circuit Judge.

This case is before us on the application of National Labor Relations Board for enforcement of its order issued against The Natural Gas Utility District of Hawkins County, Tennessee [the District], which order found that the District violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended (29 U.S.C. § 151, et seq), by refusing to bargain with the union certified by the Board as the representative of a unit of the District's pipe fitters. 167 NLRB No. 100 and 170 NLRB No. 156.

The District had refused to bargain with the union on the ground that it (the District) was a political subdivision of the state of Tennessee, therefore it was exempt from the operation of the Act and the Board had no jurisdiction over it.[1]

Section 6–2607 of the Tennessee Code, under which the Utility District was organized, provided that a District is a *'municipality'* or *public corporation* in perpetuity under its corporate name and the same shall in that name be a *body politic and corporate with power of perpetual succession,* but without any power to levy or collect taxes." [Italics added.]

The Supreme Court of Tennessee construed this statute in First Suburban Water Util. Dist. v. McCanless, 177 Tenn. 128, 146 S.W.2d 948 (1941), and held that a District organized under it was a municipal corporation and as such was an arm or instrumentality of the state.

The Board declined to follow the decision of Tennessee's highest court, relying instead on NLRB v. Randolph Elec. Membership Corp., 343 F.2d 60 (4th Cir. 1965), which case involved private non-profit utility corporations organized under the laws of North Carolina, which were formed for the exclusive benefit of their own members, did not have the power of eminent domain, were not subject to substantial control or supervision, and did not exercise any portion of the sovereign power of the state. The Board reasoned:

"The Utility Districts are not created directly by the State. They are formed by petition of property owners upon a County Judge's determination of the feasibility thereof. Thus, the District is no more a direct creation of the State than such privately-owned public service companies as railroads, and motor carriers, which also require some form of governmental approval, such as a certificate of convenience and necessity." (App., p. 15 n. 7)

This reasoning is obviously fallacious because privately owned railroads and motor carriers, even though they may have certificates of convenience and necessity, are operated for profit of their owners, whereas the District is owned and operated by the state, and not for the profit of private individuals. The District, unlike railroads and trucking companies, is a public corporation and was not subject to regulation even by the State Public Utilities Commission, and was exempt from all state taxes.

Reliance by the Board on *Randolph* is misplaced. In *Randolph*, unlike our case, there was no holding by the state's highest court that the private utilities were political subdivisions of the state.

In *Randolph* the private utilities were "formed for the exclusive benefit of its own members." Here, the District was formed for the benefit of the inhabitants of the community.

---

1. Section 2(2) of the Act provides:
 "(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." (29 U.S.C. § 152(2))

In *Randolph*, the utilities involved did not have the power of eminent domain. Here, the District not only has the power of eminent domain but also can exercise it over other governmental entities.

The Commissioners of the District further have the power to subpoena witnesses and to administer oaths. The District's records are "public records". The District is required to publish its annual statement in a newspaper of general circulation. Income from its bonds is claimed to be exempt from federal income taxes. Social Security benefits for its employees are voluntary instead of mandatory as the District is considered "a political subdivision" under 42 U.S. C. § 418(b) (5).

■ In our opinion, it was not necessary that the District be created directly by the state in order to constitute a political subdivision. It is sufficient if the District be created in conformity with state law.

■ It should be noted that the Act does not require agencies of either federal or state governments to be created directly. As a matter of fact, wholly owned government corporations, including the Federal Reserve Bank and even non-profit hospitals, are specifically exempt.[2]

Under Tennessee law the District is created by petition to the county judge, an elected official, who must find a public convenience and necessity therefor. The county judge appoints the first three commissioners nominated in the petition seeking formation of the District, and fills vacancies in the event the commissioners cannot agree among themselves. In counties having a population of 482,000 or more the commissioners of the Districts are elected at regular general elections. Although the District involved in the present case did not have the requisite number of resi-

dents to necessitate the election of its commissioners, this factor indicates that Tennessee considers the functions of a District to be that of a "political subdivision" requiring election of commissioners by the electors when the District encompasses a specified population.

Prior decisions of the Board do not support its holding here. In Mobile S. S. Ass'n, 8 NLRB 1297 (1938), the Board held that the State Docks Commission was an exempt political subdivision of the state of Alabama, without discussion of its particular functions or the legal criteria to be applied. In Oxnard Harbor Dist., 34 NLRB 1285 (1941), the Board reviewed extensively the functions of the District and held it was a political subdivision. There was no indication that any particular characteristic was determinative.

In New Jersey Turnpike Authority, 2–RC–2245, April 16, 1954, reported unofficially at 33 L.R.R.M. 1528, the Board held that the Turnpike Authority was a political subdivision in view of its powers, duties, and obligations given to it by the state. Three factors were indicated as determinative of the issue, *i. e.*, the administrators were appointed by the Governor; it had the power of eminent domain; and its bonds were tax exempt.

In New Bedford, Wood's Hole, Martha's Vineyard, etc. S. S. Authority, 127 NLRB 1322 (1960), the Authority was established to own and operate a steamship line. The Board was of the opinion that state law, *i. e.*, a determination by the highest court in the state, was controlling on what constitutes a political subdivision. In that case the Board cited West v. American Tel. & Tel. Co., 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), which held:

"True, as was intimated in the *Erie Railroad* case, the highest court of the state is the final arbiter of what is

2. We disagree with the Board's ruling that because the State does not supervise the District or remove or discipline its commissioners or subordinates, therefore the District is not a political subdivision.

We would think that the independence of the District strengthens rather than weakens the proposition that it is a political subdivision.

state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law * * *."

The Court in *Randolph* was of the view that this opinion of the Board in *New Bedford* was based on a misconception of the holding of the Supreme Court in R.F.C. v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), on which the Board relied. NLRB v. Randolph Elec. Membership Corp., *supra*, 343 F.2d at 63 n. 6. In our opinion, the Board in *New Bedford* did not err in applying the holdings in *West* and *Beaver County*. There was no conflict with national policy. The Board noted, however, in *New Bedford* that there had been no determination in the state courts as to whether the companies were political subdivisions. The Board then proceeded to review certain specific characteristics of the entities before deciding that they were exempt "political subdivisions."

The Board in *New Bedford* indicated that the following factors were important: 1—The members of the Authority were appointed and removed by the Governor with the consent of the executive council; 2—The Authority's bonds were classified as those of the state; 3—The Authority was performing essential governmental functions; 4—The Authority enjoyed tax exempt status; and 5—The bonds were exempt from taxation.

 In our opinion, the state has a right to create its own political subdivisions, and when its creations have been held by the state's highest court to constitute political subdivisions, that ought to be binding on federal administrative agencies.

It was the clear intention of Congress not to make amenable to the National Labor Relations Act employees of either federal or state governments. The effect of the order of the Board in the present case may be to extend its juris-

diction over public employees in nearly 270 Utility Districts in Tennessee, which Districts perform a wide variety of public functions.

The Court in *Randolph* gave great weight to the decision of the Board in that case because of the Board's "familiarity with labor problems and its experience in the administration of the Act." *Id.* at 62. In our judgment, the present case involves more of a question of *municipal law* than a *labor problem,* and the decision of the Supreme Court of Tennessee was of controlling importance on the question whether the District was a political subdivision of the state. In our opinion, it was binding on the Board.

Enforcement is denied.

COMBS, Circuit Judge (dissenting).

I would grant enforcement on authority of N.L.R.B. v. Randolph Electric Membership Corporation, 343 F.2d 60 (4th Cir. 1965). In that case the court upheld the Board's finding that a nonprofit corporation organized under the North Carolina Electric Membership Corporation Act was an "employer" within the meaning of 29 U.S.C. § 152(2). In discussing the scope of review of the Board's determination, the court observed at page 62:

"To the extent that it has taken into account economic realities as well as the statutory purposes, the Board's determination is entitled to great respect. [Citing case.] Our function as a reviewing court is limited to determining whether the Board's conclusion has 'warrant in the record' and a 'reasonable basis in law.'"

I think this is the proper standard. Cf. Hardin v. Kentucky Utilities Co., 390 U. S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).

Federal law, rather than state legislative or judicial pronouncements, is controlling. N.L.R.B. v. Hearst Publica-

**316**

tions, 322 U.S. 111, 64 S.Ct. 851, 88 L. Ed. 1170 (1944); N.L.R.B. v. Randolph Electric Membership Corporation, supra. In *Randolph*, 343 F.2d at page 64, the court said:

"The fact that North Carolina sees fit to characterize such corporations as 'political subdivisions' and to accord them certain benefits in respect to state taxation and otherwise * * * is not decisive * * * since their relation to the state and their actual methods of operation do not fit the label given them."

The Board concluded that the District here involved is not a "political subdivision" of the state because it was neither created directly by the state nor administered by state appointed or publicly elected officials. The Board noted that the District's operations and services do not differ significantly from those of private utilities whose employees are subject to the Act. The District is completely autonomous in the conduct of its daily affairs; the state exercises no supervision and reserves no power to remove or discipline those responsible for its operations.

Although incorporation of utility districts is authorized by an elaborate statutory scheme, respondent's actual creation resulted from the direct efforts of local residents desirous of obtaining the benefits of natural gas. The District's manager testified unequivocally that it is governed by the board of commissioners which adopts rules and regulations necessary to its operation; that the board sets all service rates; that the manager, and ultimately the board, hires and fires employees and determines wages; that neither the employees nor the District is controlled in any way by the county or state government.

It is noted that the furnishing of natural gas is the only service provided by this District and this is not necessarily a governmental function.